**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES VAUGHAN, III,** | ) | |
| | ) | **CASE NO.  1:10 CV 609** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **JUDGE LESLEY WELLS** |
| | ) | |
| | ) | **MAGISTRATE JUDGE GREG WHITE** |
| | ) | |
| **CITY OF SHAKER HEIGHTS,** *et al.*, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| **Defendants.** | ) | |

On September 11, 2014, this matter was referred pursuant to Local Rule 72.1 for pretrial supervision, including the preparation of recommendations regarding case-dispositive motions. (Doc. No.  112.)  Currently pending before the Court are (1) Defendant City of Shaker Heights' Motion for Summary Judgment (Doc. No. 90); (2) Defendant Douglas Hyams' Motion for Summary Judgment (Doc. No. 91); and, (3) Plaintiff James Vaughan, III's Partial Motion for Summary Judgment Against Defendant Hyams (Doc. No. 95).

For the following reasons, it is recommended that (1) Defendant Douglas Hyams' Motion for Summary Judgment (Doc. No. 91) be GRANTED; (2) Defendant City of Shaker Heights'

Motion for Summary Judgment (Doc. No. 90) be DENIED as moot; and, (3) Plaintiff James

Vaughan's Partial Motion for Summary Judgment (Doc. No. 95) be DENIED.

## I.  Procedural Background

On March 23, 2010, Plaintiff James Vaughan, III ("Vaughan") filed a Complaint against

the City of Shaker Heights ("Shaker Heights"); Shaker Heights Police Officers Douglas Hyams

("Hyams") and Judy Srsen ("Srsen"), in their individual and official capacities; the Cuyahoga

County Commissioners; and, John and Jane Does 1-10.  (Doc. No. 1.)  Several weeks later, on

April 5, 2010, Vaughan filed an Amended Complaint adding as a Defendant Cuyahoga County

Prosecutor William T. Mason ("Mason"), in his individual and official capacities.  (Doc. No. 3.)

The Amended Complaint asserted the following causes of action: (1) violation of Vaughan's

civil rights pursuant to 42 U.S.C. § 1983 based on the Fourth, Fifth, Sixth, and Fourteenth

Amendments to the United States Constitution; (2) violation of his constitutional rights as set

forth in 42 U.S.C. §§ 1985 and 1988, as well as a conspiracy to foster and promote perjured

testimony; (3) malicious prosecution under state law; (4) intentional infliction of emotional

distress; and, (5) indemnification.[1] (Doc. No. 3.)  Defendants moved to dismiss all claims. (Doc.

Nos. 16, 18, 19, 20.)

On August 30, 2011, this Court issued a Report & Recommendation concluding that (1)

Defendants Mason, the Cuyahoga County Commissioners, and Srsen's motions to dismiss as to

all counts should be granted; (2) Defendant Hyams' motion with respect to Vaughan's claims

under 42 U.S.C. §§ 1985 and 1988 should be granted but with respect to Vaughan's § 1983

---

[1]  The first four claims were brought against all Defendants, while Vaughan's
indemnification claim names only the City of Shaker Heights.

2

claim and state law claims for malicious prosecution and intentional infliction of emotional distress should be denied; and, (3) Defendant Shaker Heights' motion with respect to all claims except Vaughan's indemnification claim should be granted.[2] (Doc. No. 27.) The Report & Recommendation was adopted on November 28, 2011. (Doc. No. 33.) Defendants Shaker Heights and Hyams appealed.

On February 12, 2013, the Sixth Circuit affirmed in part and reversed in part. Citing the recently decided Supreme Court case *Rehberg v. Paulk*, 132 S.Ct. 1497 (2012), the court found Defendant Hyams' motion to dismiss should have been granted only to the extent Vaughan's claims were premised upon his grand jury testimony, which is protected by absolute immunity. *See Vaughan v. City of Shaker Heights*, 2013 WL 518443 at * 2 (6th Cir. Feb. 12, 2013). In all other respects, the district court's order was affirmed.[3] *Id.*

Vaughan filed a Second Amended Complaint on May 17, 2013 against the City of Shaker Heights and Defendant Hyams, in his individual and official capacities. (Doc. No. 49.) Vaughan subsequently sought and was granted leave to file a Third Amended Complaint. (Doc. No. 80.) This Complaint, which is now operative, again names the City of Shaker Heights and Detective Hyams as Defendants and alleges the following claims: (1) a *Brady* claim under §

---

[2] This matter was previously referred on March 16, 2011 for supervision of all pretrial matters, including the preparation of a report and recommendation regarding Defendants' motions to dismiss. (Doc. No. 26.)

[3] Specifically, the Sixth Circuit held that "Counts One, Three, and Four against Hyams are dismissed to the extent they are based upon Hyams' grand jury testimony, which is protected by absolute immunity. In this narrow regard, the district court's rulings are reversed. These claims may proceed if they are based in part on conduct outside of Hyams's grand jury testimony, because we decline to consider the merits of those claims. We also decline to rule on the issue of the failure to dismiss Count Five concerning indemnification against the City." *Id.*

1983 based on Defendant Hyams' alleged failure to disclose exculpatory and impeachment evidence (Count One); (2) intentional infliction of emotional distress (Count Two); and, (3) indemnification as against the City of Shaker Heights (Count Three).  Defendants filed an Answer on January 30, 2014.  (Doc. No. 81.)

On May 5, 2014, Defendant Shaker Heights filed a Motion for Summary Judgment with respect to Vaughan's indemnification claim (Count Three).  (Doc. No. 90.)  On that same date, Defendant Hyams filed a Motion for Summary Judgment with respect to Vaughan's *Brady* and intentional infliction of emotional distress claims (Counts One and Two).  (Doc. No. 91.) Vaughan then filed a Partial Motion for Summary Judgment with respect to his *Brady* claim against Defendant Hyams (Count One).[4]  (Doc. No. 95.)

## II.  Factual Allegations

On September 10, 2006, Serena Miller and her nine-year old daughter, M.M., were visiting Kelly Ross, who resided at 3598 Palmerston Road, Shaker Heights, Ohio.  (Doc. No. 97-1 at Tr. 13-14; Doc. No. 90-2 at 21-22.)  Ms. Miller and Ms. Ross were drinking and conducting a seance in the hopes of contacting their deceased mothers.  (Doc. No. 97-1 at Tr. 13-14, 18; Doc. No. 90-2 at 21-22.)  Vaughan and a friend of his were also present.  (Doc. No. 97-1 at Tr. 16, 18; Doc. No. 90-2 at 21.)

Ms. Miller kept M.M. awake for much of the night in the event that contact was made with Ms. Miller's deceased mother.  (Doc. No. 97-1 at Tr. 18; Doc. No. 90-2 at 21.)  At some point during the early morning hours of September 10th, however, M.M. fell asleep.  (Doc. No.

---

[4]  On June 7, 2014, Vaughan filed a Motion to Strike Defendants' Expert Report or, in the alternative, to Depose Defendants' Expert (Doc. No. 105.)  In a separate Order issued this date, this motion was denied as moot.

4

97-1 at Tr. 18; Doc. No. 90-2 at 28.) Vaughan carried M.M. to the bedroom, and returned a few minutes later. (Doc. No. 97-1 at Tr. 18-19; Doc. No. 90-2 at 21, 28.)

Shortly thereafter, M.M. came out of the bedroom crying and asked to speak with her mother. (Doc. No. 90-2 at 28; Doc. No. 97-1 at Tr. 19-20.) As set forth in Ms. Miller's written statement to police dated September 10, 2006, M.M. "told [Ms. Miller] that she pretended to be asleep and when [Vaughan] put her to bed he put his fingers in her panties."[5] (Doc. No. 90-2 at 28.) Ms. Miller told Ms. Ross what M.M. had reported, and Ms. Ross told Vaughan and his friend to leave. (Doc. No. 90-2 at 20-21.) Ms. Ross then called the Shaker Heights Police Department. (Doc. No. 90-2 at 21.)

The Shaker Heights police dispatch report indicates "Kelly Ross called police to report that a juvenile female staying at her home had been touched and possibly penetrated anally by a male." (Doc. No. 90-2 at 18.) Shaker Heights police officer Jody Srsen responded and arrived at the Palmerston residence shortly after Ms. Ross' call.[6] (Doc. No. 92-4 at 10.) Officer Srsen testified she remained at the residence for approximately 45 minutes to an hour, during which time she spoke with Ms. Miller, Ms. Ross, and M.M.[7] *Id.* at 11-12, 27. Ms. Miller reported to

---

[5] During her deposition, Ms. Miller testified that M.M. "said that James Vaughan, while he was, that she woke up while he was carrying her back [to the bedroom], and she pretended that she was still asleep when he laid her down, and he put his fingers inside of her." (Doc. No. 97-1 at Tr. 20.)

[6] Officer Srsen subsequently married and changed her name to Jody Danko. This Report & Recommendation will refer to her as Officer Srsen, as that was the name by which she was known during the relevant time period.

[7] Officer Srsen also spoke to the seven-year old child of an upstairs neighbor, as well as the child's mother. (Doc. No. 92-4 at 12.) This child was sleeping at Ms. Ross' home on the evening in question in the bedroom where Vaughan carried M.M. The child indicated she was asleep the entire time and did not hear or see anything. (Doc. No. 90-2 at 21.)

5

Officer Srsen that M.M. had told her (Ms. Miller) that "James Vaughan had put his hand into her

panties and touched her private area."  (Doc. No. 90-2 at 21.)  Officer Srsen's conversation with

M.M. is summarized in Srsen's police report, as follows:

> I spoke with [M.M.] who related the following: She was sleeping but woke
> when James Vaughn [sic] was carrying her to the bedroom. As he was putting
> her down on the bed, she said that he put his hand into the side of her panties by
> the leg hole.  She was not sure which leg.  He touched her in the vaginal area
> with his fingers.  She said that he put his finger into her anus.  At that time she
> pushed away from him and he took his hand away and left the room.  She said
> that she did not scream or call out because she was so frightened.  She said that
> after he left the room she went and called her mother.

*Id.*  During her deposition, Officer Srsen testified the above was an accurate summary of the

conversation she had with M.M. on September 10, 2006.  (Doc. No. 92-4 at 53-54.)

Officer Srsen then transported Ms. Miller and M.M. to University Hospitals Rainbow

Babies & Children's Hospital for examination.  (Doc. No. 92-4 at 23.)  There, M.M. was treated

by pediatric emergency room resident Nicole Bailey and attending physician Haitham Haddad.

Dr. Haddad testified that University Hospitals' protocol for handling allegations of child sexual

abuse is for the doctor to gather all information about what allegedly occurred from the child's

parent or guardian.  (Doc. No. 92-1 at Tr. 11-13.)  He stated he did not interview M.M. but,

rather, relied on information he obtained from Dr. Bailey and M.M.'s mother.[8]  *Id.* at Tr. 38-39.

Dr. Bailey's report indicates a diagnosis of sexual assault and states "[n]eighbor placed

fingers in pt's vagina and rectum."  (Doc. No. 90-2 at 43.)  Dr. Haddad's written report also

---

[8] Vaughan cites testimony of Dr. Bailey from Vaughan's first criminal trial, in which Dr. Bailey testified that "everything that I've documented in [M.M.'s] chart is what I was told by the mother." (Doc. No. 22-3 at 72.)  The Court has not been provided with a complete transcript of Dr. Bailey's trial testimony, nor have the parties filed a transcript of Dr. Bailey's deposition (if any) in this case. Thus, and as discussed in more detail *infra*, the Court will not consider the excerpts from Dr. Bailey's trial testimony cited by Plaintiff herein.

reflects the following history: "[t]he guy carried [M.M.] over to the bedroom and put her in bed and reportedly inserted his finger in her vagina and anus." *Id*. at 51. Additionally, the record contains a document entitled "Uniform Report for Child Protection," which Dr. Haddad testified is prepared by University Hospitals and submitted to the County. (Doc. No. 92-1 at Tr. 32.) This document states that "[p]er the M.D., the pt disclosed she was vaginally penetrated by the suspected perpetrator's finger."[9] (Doc. No. 90-2 at 47.) M.M.'s examination did not reveal any physical injuries that were consistent with sexual assault. (Doc. No. 92-1 at Tr. 42; Doc. No. 90-2 at 51.) Dr. Haddad testified in deposition, however, that sexual assault does not always leave physical evidence. *Id*. at Tr. 40. The hospital's records indicate M.M. was discharged on September 10, 2006 with a diagnosis of sexual assault. (Doc. No. 90-2 at 45.)

Defendant Hyams was assigned to the case on September 11, 2006. (Hyams Affidavit, Doc. No. 96-1, at ¶ 1) (hereinafter "Hyams Aff."). That same day, he contacted Ms. Miller and advised her a complaint had been filed with the Summit County Department of Children's and Family Services ("Summit County DCFS"), and he would be working with Summit County DCFS in investigating the alleged crime. (Doc. No. 90-2 at 23.)

Summit County DCFS assigned social worker Terrie Stout. On September 18, 2006, Ms. Stout contacted Defendant Hyams to advise him that Summit County DCFS had not yet made contact with Ms. Miller, despite attempts to call and visit her home. (Doc. No. 90-2 at 24.) Later that day, however, Ms. Stout went to Ms. Miller's home and was able to meet with and

---

[9] It is not clear who authored this report. Dr. Haddad testified he did not have any input into this particular report, and that he believed the reference to an M.D. likely referred to the resident in this case, Dr. Bailey. (Doc. No. 92-1 at Tr. 32-33.)

conduct an assessment of M.M.[10]  *Id*. at 34-36.  Ms. Stout's written report summarizes her

conversation with M.M. in relevant part, as follows:

> [M.M.] explained that she and her mom had spent the night at Kelly's house with
> Kelly and [Kelly's children.] [M.M.] said it was late at night when she and
> [another child] woke up and went to the dining room where her mom, Kelly, and
> the two guys were. [M.M.] could not identify either "guy" by name.  She said
> they were in the dark and the candle was lit and that the lights had gone out.
> [M.M.] said she sat on her mom's lap then sat on "his" lap where she fell asleep.
> [M.M.] then said she woke up when "he" was caring [sic] her to bed. She said she
> woke up because "it hurt."  This worker asked "what hurt" and she said "he" had
> put his hands and fingers inside of her underpants. [M.M.] explained it was his
> hands and fingers and they were inside, not outside of her underwear.  This
> worker asked "then what happened["] and she said he put his fingers inside of her.
> [M.M.] then said he tried to "stick his finger in the back of me." [M.M.] then
> stated she tried to "scoot up and away from him."  M.M. said she thinks he then
> left because he "thought she was awake."

(Doc. No. 90-2 at 34-35.)[11]

The following day, September 19, 2006, Defendant Hyams received a voice mail

message from Ms. Stout.  Defendant Hyams' police report summarized this message as follows:

> On 9/19/06 I received a voice mail from Terry Stout. Ms. Stout informed me she
> met with the victim.  From Ms. Stout's perspective, the victim appears credible.
> During the interview with Ms. Stout, the victim stated she was sleeping and felt
> the suspect fondling her vagina and anus.  Once the victim awoke, the suspect
> quickly left the room.

(Doc. No. 90-2 at 24.)  Hyams spoke with Ms. Stout on September 20, 2006.  He summarized

this conversation in his police report as follows:

---

[10]Defendant Hyams testified during deposition that he did not seek to participate in Ms.
Stout's assessment of M.M. because he did not have the requisite experience in interviewing
child sexual assault victims.  (Doc. No. 93-1 at 76-77.)  Moreover, he stated that "as a procedure
. . . we turn these kind of interviews of child victims over to social services." *Id*.

[11] Ms. Stout's written report is dated September 20, 2006 and is in the form of a letter to
Defendant Hyams. (Doc. No. 90-2 at 34-36.)

8

> On 9/20/06, I spoke with Ms. Stout.  It's Ms. Stout's opinion a charge of rape may be hard to prosecute.  Ms. Stout based her opinion on the lack of physical evidence and Ms. Miller's lack of proper care she provided to her child (i.e. drinking throughout the night, keeping the children awake until 6:00 a.m. for the seance, and allowing another to put her child to bed).

*Id.*  During deposition, Defendant Hyams testified Ms. Stout did not, at any point during his investigation, indicate to him that "the child denied penetration."  (Doc. No. 93-1 at 82; Hyams Aff. at ¶ 8.)  Ms. Stout later closed her case file with a finding that the case was substantiated for fondling.  (Doc. No. 92-3 at Tr. 133, 164.)

On September 21, 2006, Defendant Hyams met with Shaker Heights prosecutor Randy Keller and provided his complete case file regarding the incident involving M.M.  (Doc. No. 93-1 at 34-35, 39.)  Prosecutor Keller decided to charge Vaughan with gross sexual imposition ("GSI") in violation of Ohio Rev. Code §2907.05(A)(4), which involves sexual contact but does not require penetration.[12]  (Hyams Aff. at ¶ 12; Doc. No. 94-1 at 21-22.)  Vaughan was arrested on September 23, 2006.  *Id.* at ¶ 13.

The matter was bound over to the Cuyahoga County Grand Jury and thereafter handled by the County Prosecutor's Office.  Hyams states that, "[w]hen cases are prosecuted by the Cuyahoga County Prosecutor arising out of arrests by the Shaker Heights Police Department, a Shaker Heights detective, not necessarily the assigned detective, would deliver a stack of files to

---

[12] Specifically, Ohio Rev. Code § 2907.05(A)(4) provides that: "(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies: * * * (4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person." The term "sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." Ohio Rev. Code § 2907.01(B).

the Cuyahoga County Prosecutor." (Hyams Aff. at ¶ 14.)  Hyams believes that "someone would have delivered [Vaughan's] physical file to the Cuyahoga County Prosecutor."  *Id.*  In addition, Hyams testified that, on October 3, 2006,  he faxed "everything he had" in his case file to the County Prosecutor's Office.  (Doc. No. 93-1 at 45-46, 59, 67-68.)  Specifically, Hyams avers that he faxed two sets of materials to that Office, including M.M.'s medical records and documents from the Shaker Heights Police Department file.[13]  (Hyams Aff. at ¶¶ 15, 16.)  In addition, Hyams prepared two Case Information Forms ("CIFs"), which he also faxed to the County Prosecutor's Office.  In the sections on these forms calling for a "synopsis of the offense," Hyams wrote that Vaughan "digitally penetrated victim's vagina and anus. Victim is 9 years old."  (Hyams Aff. at ¶ 17.)

The Cuyahoga County Prosecutor decided to seek an indictment for rape in violation of Ohio Revised Code 2907.02(A)(1)(b), which requires a showing that the victim was penetrated.[14] *See* Docket Sheet for *State v. Vaughan*, Cuyahoga County Common Pleas Case No. CR-06-

_____

[13]In support of this assertion, Hyams refers to two sets of faxed documents produced under subpoena by the Cuyahoga County Prosecutor's Office, one of which appears to have originally contained 15 pages and the other 31 pages.  (Hyams Aff. at ¶ 15.) Hyams notes that nine pages of the 31 page fax are missing.  *Id.*  He states that "I believe those pages would have included the September 20, 2006 Stout report as well as additional pages from the Shaker Heights file." *Id.*

[14] Ohio Rev. Code § 2907.02(A)(1)(b) provides that "(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender . . . ., when any of the following applies: * * * (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person."  The term "sexual conduct" means "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, **the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another.  Penetration, however slight, is sufficient to complete vaginal or anal intercourse**." Ohio Rev. Code § 2907.01(A)(emphasis added).

487022A (hereinafter "Docket")  Defendant Hyams appeared and testified before the Grand

Jury.  (Hyams Aff. at ¶ 20.)  On October 11, 2006, the Cuyahoga County Grand Jury indicted

Vaughan for rape.  *See* Docket Sheet.  Vaughan, who was represented by defense attorney

Joseph Dubyak, entered a plea of not guilty on October 25, 2006.  *Id.*  On March 24, 2008,

Vaughan waived his right to a jury trial and proceeded to bench trial before Cuyahoga County

Court of Common Pleas Judge Joseph Russo.  *Id.*  Although it subpoenaed Ms. Stout, the State

was unable to locate her and she did not testify at trial.[15]  (Doc. No. 92-9 at Tr. 68; Doc. No. 92-3

at Tr. 138-139.)  Defendant Hyams was called, however, and testified regarding his investigation

of the September 10, 2006 incident involving M.M.  On March 27, 2008, Judge Russo found

Vaughan guilty as charged.[16]  *See* Docket Sheet.

Vaughan then obtained a new defense team, consisting of Gerald Gold and Ian Friedman.

Vaughan thereafter filed a Motion for New Trial based (in part) on information obtained by an

investigator who found and interviewed Ms. Stout.  On March 12th and 17th, 2009, Cuyahoga

County Court of Common Pleas Judge David Matia conducted a hearing on Vaughan's motion.

During this hearing, Ms. Stout testified (among other things) that M.M. did not disclose

penetration to Ms. Stout during her September 18, 2006 assessment.  (Doc. No. 107-1 at Tr. 36,

39; Doc. No. 107-2 at 15.)  Ms. Stout also testified she "really did not see in this situation that

any penetration occurred," and confirmed that, after her interview of M.M., she was confident

---

[15] Ms. Stout testified she was unaware she had been subpoenaed until after the trial concluded. This was because the subpoena was sent to Summit County DCFS and Ms. Stout did not work there at the time.  (Doc. No. 92-3 at Tr. 138-139.)

[16] The state trial court docket sheet does not reflect that Vaughan was sentenced on his original conviction for rape.  *See State v. Vaughan*, Cuyahoga County Common Pleas Case No. CR-06-487022A.

M.M. "was not penetrated in any form." (Doc. No. 107-2 at Tr. 15, 107-1 at Tr. 39.) Ms. Stout also testified that she told Defendant Hyams that M.M. did not disclose penetration. (Doc. No. 107-2 at Tr. 15.)

At the conclusion of the hearing, on March 17, 2009, Judge Matia granted Vaughan's Motion for New Trial from the bench. In so ruling, he stated "[t]he argument that this Court finds compelling in regard to [Vaughan's] motion is that the testimony of Terrie Stout was not discovered during the course of discovery." (Doc. No. 107-2 at 146.) Judge Matia noted that Ms. Stout "came into this court over two days and clearly stated that the alleged child victim, [M.M.], did not indicate that she was digitally penetrated either vaginally or anally." *Id.* at 148. He further explained as follows:

> Mr. Vaughan was convicted of rape of a child which carries with it a life sentence. There is a big difference between rape of a child and mere gross sexual imposition which carries with it a maximum five year penalty. Miss Stout gave an unequivocal opinion in here or statement that contradicts what was testified to at trial by the victim. That is certainly evidence that might have changed the results or the verdict and that is what I'm basing my decision upon, the undiscovered testimony of Terrie Stout. That's it. That's all we really need to talk about here in the motion for new trial.

*Id.* Vaughan's second criminal trial began on June 1, 2009, this time before a jury. *See* Docket Sheet. On June 4, 2009, Vaughan was found not guilty of rape as charged in the original indictment. *Id.*

### III. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) governs summary judgment motions and states:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

12

In considering summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989)(*citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact.  *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Id*.  "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery."  *Anderson*, 477 U.S. at 257.

In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007).  When ruling on a motion for summary judgment, "a judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a

13

preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" *Anderson*, 477 U.S. at 252 (citations omitted); *accord Fuller v. Landmark 4 LLC*, 2012 WL 1941792 (N.D. Ohio May 29, 2012). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter ...." *Anderson*, 477 U.S. at 249. "It is an error for the district court to resolve credibility issues against the nonmovant." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008).

### IV.  Law and Analysis

#### A.      Evidentiary Matters

Defendants assert that, in resolving the parties' cross motions for summary judgment, the Court should not consider the transcript of the March 2009 state court hearing on Vaughan's motion for new trial because it is unauthenticated and constitutes improper hearsay. Specifically, Defendants maintain that "all references to Terrie Stout's testimony at the plaintiff's motion for new trial in 2009 [and] Judge Matia's ruling granting the plaintiff a new trial" should be stricken as improper summary judgment material under Fed. R. Civ. P. 56(c). Defendants also maintain that Vaughan's citation to excerpts from Dr. Bailey's testimony during his first criminal trial should be disregarded for the same reasons, noting in particular that Dr. Bailey was never deposed in this matter. (Doc. No. 102 at 7-8, 108 at 10-11.)

Vaughan argues Ms. Stout's hearing testimony is properly considered because Ms. Stout was deposed in this matter and, during that deposition, "testified at length about her prior hearing testimony with the aid of the transcript, which was marked as an exhibit." (Doc. No. 110 at 2.)

Vaughan also maintains Ms. Stout's hearing testimony is not hearsay under Fed. R. Evid. 801(d) because "portions of [that] prior hearing testimony could be used at trial as either prior consistent or inconsistent statements."  *Id.* at 4.  Vaughan does not address Defendants' arguments that the Court should not consider Dr. Bailey's trial testimony or Judge Matia's ruling from the bench granting Vaughan a new trial.

Pursuant to Fed. R. Civ. Pr. 56(c)(2), a party may claim that "material cited to support or dispute a fact" may not be considered on summary judgment review because it would not be admissible in evidence.  *See* Rule 56(c)(2).  *See also Weldon v. Warren County Children Services,* 2013 WL 6256476 at * 2 (S.D. Ohio Dec. 4, 2013).  Interpreting this Rule, the Sixth Circuit has explained that, "while '[t]he submissions . . . by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial,' that party must 'lay [ ] out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists.'"  *Reed v. Procter & Gamble Manufacturing Co.,* 556 Fed. Appx. 421, 427 (6th Cir. Feb. 13, 2014) (quoting *Alexander v. CareSource,* 576 F.3d 551, 558 (6th Cir. 2009)). *See also Bailey v. Floyd County Board of Education,* 106 F.3d 135, 145 (6th Cir. 1997) (explaining that "[t]he proffered evidence need not be in admissible form, but its content must be admissible"); *Wiley v. United States,* 20 F.3d 222, 226 (6th Cir. 1994) ("Only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment"); *Trantor v. Orick,* 460 Fed. Appx. 513, 514 (6th Cir. 2012); *Weldon,* 2013 WL 6256476 at *2.

Thus, the Sixth Circuit has repeatedly held that, because unauthenticated documents are

inadmissible,[17] they do not meet the requirements of Rule 56.  *See e.g. Alexander*, 576 F.3d at 558; *David A. Flynn, Inc. v. GMAC*, 345 Fed. Appx. 974, 979 (6th Cir. 2009) ("This Court has repeatedly emphasized that unauthenticated documents do not meet the requirements of Rule 56(e)"); *Magnum Towing and Recovery v. City of Toledo*, 287 Fed. Appx. 442, 448 (6th Cir. 2008) ("The district court properly did not consider any documents that were unauthenticated or failed to meet the requirements of Rule 56(e)").  For the same reasons, it is well-established that "hearsay evidence not subject to any exception 'must be disregarded.'" *Reed*, 556 Fed. Appx. at 427 (quoting *Alexander*, 576 F.3d at 558).  *See also Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007); *Wiley*, 20 F.3d at 225-26 (stating that "hearsay evidence cannot be considered on a motion for summary judgment").

Defendants argue the Court should disregard the March 2009 hearing transcript because it is unauthenticated.  Defendants provide no further explanation of their basis for challenging the authenticity of this document, other than a brief citation to a federal district court decision from Kansas, *Bell v. City of Topeka, Kansas*, 496 F.Supp.2d 1182 (D. Kan 2007).  In *Bell*, defendant objected to a collection of documents attached as an exhibit to plaintiff's summary judgment response.  That exhibit contained an affidavit from plaintiff's counsel that purported to authenticate a deposition transcript and exhibits used in that deposition.  The district court found the deposition exhibits were not properly authenticated because "[t]he personal affidavit submitted by plaintiff's counsel is insufficient to provide authentication when plaintiff's counsel

---

[17] As explained in a recent decision from the Southern District of Ohio, "[a]uthentication is an aspect of relevancy concerned with establishing the genuineness of evidence and is 'a condition precedent to admissibility.'" *Weldon*, 2013 WL 6256476 at * 3 (quoting Fed. R. Evid. 901(a) and that Rule's advisory committee notes).

is not the author of those documents nor does he state that he has any personal knowledge of the facts contained within those documents." *Bell*, 496 F.Supp.2d at 1185.  In addition, the court found that the witness' deposition "fail[ed] to authenticate these exhibits when there is no citation to a relevant portion of that deposition showing that [the witness] has personal knowledge of the facts contained within the exhibits." *Id.*

The Court finds *Bell* to be distinguishable from the instant case.  When Ms. Stout was deposed in this matter, she was presented with the transcript of her hearing testimony and confirmed that certain portions of her testimony were true and accurate at the time. (Doc. No. 92-3 at Tr. 164, 169, 184-185, 191-192.)  Ms. Stout also expressly testified in deposition that her testimony before Judge Matia during the hearing on Vaughan's motion for new trial was truthful. (Doc. No. 92-3 at 221.)  Thus, unlike plaintiff's counsel in *Bell* who had no personal knowledge of the facts contained within the documents he purported to authenticate, Ms. Stout clearly has personal knowledge of whether her hearing testimony before Judge Matia was truthful and accurately recorded in the hearing transcript.  Accordingly, the Court finds *Bell* is distinguishable from the instant case and Ms. Stout's deposition testimony is sufficient to authenticate, at a minimum, those portions of her hearing testimony regarding which she was specifically questioned during deposition.

The Court further notes that Vaughan submitted copies of the complete hearing transcripts before Judge Matia for the Court's review.  (Doc. Nos. 107-1 and 107-2.)  These copies include cover sheets identifying the state court, case caption, and date of proceedings; as well as certifications from the court reporter for each day of testimony that the "transcript is a complete record of the proceedings had in the trial of said cause and constitutes a true and

17

correct Transcript of Proceedings had therein."  (Doc. No. 107-1 at 56; Doc. No. 107-2 at 157.)

Moreover, Defendants do not argue that the copies of the hearing transcripts submitted by

Vaughan are inaccurate or incomplete.  Accordingly, and based on the lack of any evidence or

argument the hearing transcripts submitted by Vaughan are not what they purport to be, the

Court also finds that Judge Matia's ruling from the bench granting Vaughan's motion for new

trial is sufficiently authenticated for purposes of the instant motions for summary judgment.

      The Court is not convinced, however, of the authenticity of the excerpts of Dr. Bailey's

trial testimony upon which Vaughan now relies.  In both his Partial Motion for Summary

Judgment (Doc. No. 95) and Brief in Opposition to Defendants' Motions for Summary Judgment

(Doc. No. 106-1), Vaughan directs this Court's attention to various exhibits attached to his Brief

in Opposition to Defendants' Motions to Dismiss, which was filed in September 2010.  (Doc. No

22.)  Among these exhibits, is a two-page document marked as Exhibit 49, which purports to be

an excerpt of Dr. Bailey's testimony during Vaughan's first criminal trial.  (Doc. No. 95 at 3 and

Doc. No. 106-1 at 9, citing Doc. 22-3 at 71-72 (Exh. 49)).  Vaughan does not provide any

explanation as to how this document is sufficiently authenticated so as to constitute proper

summary judgment material under Rule 56.  There is no cover page identifying the court or case

caption, nor is there a certification from the state court reporter attesting that it is a true and

accurate recording of the proceedings.  Moreover, Vaughan does not provide an affidavit that

purports to authenticate this document, nor does he direct this Court's attention to any deposition

testimony from Dr. Bailey in this action that might serve that purpose.  Accordingly, and in the

complete absence of any attempt to properly authenticate this exhibit, the Court finds the excerpt

of Dr. Bailey's trial testimony relied upon by Vaughan is unauthenticated and will not be

considered herein.[18]

Defendants' hearsay argument appears to be directed solely to Ms. Stout's hearing testimony.  It consists only of a citation to the definition of "hearsay" and the statement that "the prior testimony by Terrie Stout was not made while testifying at the current trial or hearing" and, "[t]herefore, it is inadmissible hearsay and cannot be considered by this Court." (Doc. No. 108 at 11.)

The Court disagrees.  Fed. R. Evid. 801(d) provides that statements meeting the following conditions do not constitute hearsay:

> **(1) A Declarant-Witness's Prior Statement**.  The declarant testifies and is subject to cross-examination about a prior statement, and the statement:
>
> > **(A)** is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition;
> >
> > **(B)** is consistent with the declarant's testimony and is offered to rebut the express or implied charge that the declarant recently fabricated it or acted from a

---

[18] Curiously, many of the documents relied upon by Vaughan in support of his Partial Motion for Summary Judgment and in opposition to Defendants' Summary Judgment motions are those attached to his Brief in Opposition to Defendants' Motion to Dismiss (hereinafter referred to as "Doc. No. 22"), which was filed over four years ago.  None of these documents appear to be properly authenticated.  However, as Defendants do not raise an objection to anything other than the hearing transcripts and Dr. Bailey's excerpted trial testimony, the Court will not *sua sponte* strike the exhibits attached to Doc. No. 22.  The Court does note some concern regarding Vaughan's citation to copies of documents purporting to be Ms. Stout's type-written notes, which are attached as Exhibits 41 and 43 to Doc. No. 22.  These exhibits appear to be duplicative of confidential documents that were subsequently released by this Court after *in camera* review of the Summit County Children's Services file relating to this incident, and subject to certain stringent Conditions of Disclosure set forth in an Order issued July 30, 2013. (Doc. No. 59.)  As no objection has been raised to Vaughan's reliance on these documents, and they appear to be identical to those produced as part of this Court's *in camera* inspection, the Court will consider Exhibits 41 and 43 to Doc. No. 22 in connection with the parties' cross motions for summary judgment.  It bears noting, however, that these highly confidential documents should not have been cited in the manner in which they were.  The Court has since placed these exhibits under seal.

19

recent improper influence or motive in so testifying; or

(C) identifies a person as someone the declarant perceived earlier.

Fed. R. Evid. 801(d)(1).  Upon careful review, the Court agrees Ms. Stout's hearing testimony

falls within this provision.  Ms. Stout testified at deposition and was extensively examined by

counsel for both Vaughan and Defendants herein.  Among other things, Ms. Stout was

specifically questioned about her hearing testimony before Judge Matia, portions of which were

arguably inconsistent with her testimony during deposition.  Accordingly, the Court finds that

Ms. Stout's hearing testimony qualifies as a prior statement under Rule 801(d)(1) and should not

be disregarded on the grounds that it constitutes inadmissible hearsay.

Accordingly, in ruling on the parties' cross- motions for summary judgment, the Court

will consider (1) those portions of Ms. Stout's hearing testimony regarding which she was

specifically questioned during deposition; and, (2) Judge Matia's ruling from the bench granting

Vaughan's motion for new trial.  The Court will not, however, consider Dr. Bailey's excerpted

trial testimony.

**B.     Section 1983 *Brady* Claim**

To maintain a claim under § 1983, a plaintiff must establish that he was deprived of a

right secured by the Constitution or the laws of the United States, and that the deprivation was

caused by a person acting under color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988);

*Simescu v. Emmet County Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991).  Section

1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating

federal rights elsewhere conferred."  *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979).  The

first step in any such claim is to identify the specific constitutional right allegedly infringed.

20

*Graham v. Connor*, 490 U.S. 386, 394 (1989); *Baker*, 443 U.S. at 140.

Here, Vaughan claims Defendant Hyams violated his due process rights by failing to disclose apparent, material, and exculpatory evidence. (Third Amended Compl. at ¶ 98.) Specifically, Vaughan claims Hyams "failed to disclose that Ms. Stout had told him that her assessment of M.M. had led her to conclude that Vaughan had never penetrated M.M." *Id.* Vaughan also asserts that Hyams "failed to disclose that he learned from Ms. Stout that M.M. never told her (Stout) that Vaughan had committed any act that supported the charge of rape, for which Vaughan was indicted and wrongfully convicted." *Id.* at ¶ 99.

Defendant Hyams argues he is entitled to summary judgment on Vaughan's *Brady* claim on the basis of qualified immunity[19] because "the facts show that [he] did not fail to disclose any exculpatory evidence." (Doc. No. 91-1 at 6.) He maintains it is undisputed he disclosed to the prosecution Ms. Stout's communication that M.M. claimed Vaughan fondled her, and that this is sufficient to convey that M.M. did not report penetration. Hyams further argues that "Stout's identity and any opinions she had were not 'wholly within the control' of Det. Hyams, as the prosecution and defense could have spoken to her" and "any statement Stout may have made about M.M. reporting fondling rather than penetration was duplicative with other trial testimony." *Id.* at 7. Finally, Hyams maintains that, "[e]ven assuming the conversation with

---

[19] Although not clearly articulated as such, the Court interprets Defendant Hyams' motion as seeking summary judgment on the basis of qualified immunity. In that motion, Hyams first argues that no constitutional violation occurred because Hyams did not fail to disclose the "particular piece of exculpatory information" at issue herein. He then argues that, even if the Court were to find that Hyams did have such a duty, it "was not clearly established at the time of the alleged Constitutional violation in 2006." (Doc. No. 91-1 at 22-23.) As this argument tracks the language and structure of a qualified immunity analysis, the Court interprets Defendants' motion as seeking summary judgment on that basis.

21

Stout was not disclosed . . . the claim is legally deficient because the contents of a conversation with a witness known to the defense, who could have been interviewed by defense counsel if counsel so chose on a matter such as credibility which was already at issue, is not *Brady/Moldowan* evidence as established by the case law." *Id.*

Qualified immunity protects public officials from liability for civil damages if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Sixth Circuit follows a "two-tiered inquiry" to determine if an officer is entitled to qualified immunity. *Austin v. Redford Twp. Police Dept.*, 690 F.3d 490, 496 (6th Cir. 2012). *See also Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). The first step is to determine whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated. *See Pearson*, 555 U.S. at 232; *Everson v. Leis*, 556 F.3d 484, 493 (6th Cir. 2009); *Pritchard v. Hamilton Township Board of Trustees*, 2011 WL 2039066 at * 5 (6th Cir. May 25, 2011). The second is to ask if the right at issue was "clearly established" when the event occurred such that a reasonable officer would have known that his conduct violated it. *Pearson,* 555 U.S. at 232. *See also Martin*, 712 F.3d at 957. The Supreme Court has explained that these two steps may be addressed in any order. *Pearson*, 555 U.S. at 236. "But both must be answered in the affirmative for the case to go to a factfinder to decide if each officer's conduct in the particular circumstances violated a plaintiff's clearly established constitutional rights." *Martin*, 712 F.3d at 957. If either one is not satisfied, qualified immunity will shield the officer from civil damages. *Id. See also Pearson*, 555 U.S. at 236.

22

Where, as here, a defendant moves for summary judgment based on qualified immunity, "the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Everson,* 556 F.3d at 494. *See also Baker v. City of Hamilton*, 471 F.3d 601, 606 (6th Cir. 2006); *Six v. Beegle*, 2013 WL 5707245 at * 5 (S.D. Ohio Oct. 18, 2013); *Caudill v. City of Kenton*, 2012 WL 1621372 at * 3 (N.D. Ohio May 9, 2012).  As the Sixth Circuit has explained, the plaintiff has the initial burden of showing that a right is clearly established.  *See Everson*, 556 F.3d at 494; *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 970 (6th Cir. 2004).  However, the defendant carries the burden of showing that the challenged act was objectively reasonable in light of the law existing at the time.  *Everson*, 556 F.3d at 494.  *See also Tucker v. City of Richmond*, 388 F.3d 216, 220 (6th Cir. 2004); *May v. Hamilton County, Ohio*, 2011 WL 5925544 at * 4 (S.D. Ohio Aug. 3, 2011).  Moreover, "[w]hile the facts are normally taken as alleged by the plaintiff, facts that absolutely contradict the record will not be considered as claimed by the plaintiff."  *Everson*, 556 F.3d at 494 (citing *Marvin v. City of Taylor*, 509 F.3d 234, 249 (6th Cir. 2007)).

In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  To establish a claim under *Brady*,  the claimant has the burden of establishing that (1) the evidence at issue is favorable to him; (2) such evidence was suppressed; and, (3) the suppressed evidence was material.  *See Harbison v. Bell,* 408 F.3d 823, 830 (6th Cir. 2005); *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *Provience v. City of Detroit*, 529 Fed. Appx. 661, 665 (6th Cir. 2013).  *See also Strickler v. Greene,* 527 U.S. 263,

23

281-82 (1999).

"Favorable" evidence under *Brady* is exculpatory evidence, including impeachment material.  *See Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003) ("The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching").  Favorable evidence is "material" for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different."  *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555 (1995).  *See also Castleberry*, 349 F.3d at 291; *Provience*, 529 Fed Appx. at 666.  In determining reasonable probability,  the question is whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'"  *Castleberry*, 349 F.3d at 291 (quoting *Kyles*, 514 U.S. at 434).[20]

The Sixth Circuit has also held there is no *Brady* violation "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose."  *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir.

---

[20]  In *Kyles*, the Supreme Court emphasized four aspects of materiality.  First, the Court explained that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. at 434.  Second, materiality is not a sufficiency of the evidence test.  Even if the evidence, including the suppressed exculpatory evidence, is sufficient to support a conviction, a *Brady* claim may still be successful.  *Id*. at 435.  A *Brady* violation is proven by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Id*.  Third, once a *Brady* violation is found, there is no need for further harmless-error review, as a *Brady* violation is never harmless. *Id.*  Fourth, when materiality is assessed, the suppressed evidence must be considered collectively, not item by item. *Kyles,* 514 U.S. at 436.

1998).  *See also Spirko v. Mitchell*, 368 F.3d 603, 610 (6th Cir. 2004) (stating that "where the defendant was 'aware of the essential facts that would enable him to take advantage of the exculpatory evidence,' the government's failure to disclose it did not violate *Brady*")(quoting *United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990)); *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000); *Army v. Collins*, 2012 WL 2913736 at * 4 (6th Cir. July 18, 2012).  Moreover, "[u]ndisclosed evidence that is cumulative of other evidence does not support a *Brady* violation." *Provience*, 529 Fed. Appx. at 666 (citing *United States v. Warshak*, 631 F.3d 266, 300-301 (6th Cir. 2010)).

In *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009), the Sixth Circuit extended *Brady* to police officers, holding it imposes a derivative obligation on police officers to disclose material, exculpatory evidence to the prosecution.  In that case, Moldowan was convicted of kidnaping, assault with intent to commit murder, and two counts of criminal sexual conduct in the first degree arising out of the abduction and sexual assault of his ex-girlfriend, Maureen Fournier.  At trial, Fournier testified she had been abducted, beaten, and raped by four Caucasian males, including Moldowan.  After trial, Moldowan's family hired a private investigator who located a witness, Jerry Burroughs, whose identity had not been previously known to the defense.  Burroughs reported that, on the night in question, "he saw four African-American males standing around a naked white female who was lying in the street." *Id*. at 365.  Burroughs further stated that, approximately one week after the assault, he overhead two of those same men talking about the incident and bragging that they had participated in the assault. *Id*.  Finally, Burroughs claimed he reported this information to a police officer, but the officer "just acted like I [was] saying nothing." *Id.* at 382.

25

Based in part on Burroughs' statement, the Michigan Supreme Court reversed Moldowan's conviction and remanded the matter for a new trial. *Id*. at 366. On retrial, Moldowan was acquitted of all charges and released, after having spent 12 years in prison. *Id*. Moldowan then brought a civil rights action under 42 U.S.C. § 1983 against a number of defendants including the Warren Police Detective assigned to the investigation, Don Ingles. Moldowan argued Detective Ingles had, in fact, interviewed Burroughs but failed to disclose his identity or statements to the prosecution in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments. The district court denied Ingles' motion for summary judgment on the basis of qualified immunity, finding "there are far too many questions of fact here." *Id.* at 367. Ingles appealed.

The Sixth Circuit began by acknowledging that "[t]o the extent that *Brady* imposes an obligation on the state to disclose exculpatory evidence to the defense, courts consistently have determined that this duty falls squarely on the prosecutor, not the police." *Id*. at 377. However, the court cautioned that this well-established rule "does not imply that the police have no role to play in ensuring that the state complies with its obligations under *Brady*, or that the police cannot commit a constitutional violation analogous to the deprivation recognized in *Brady*." *Id.* at 378. Rather, the court explained as follows:

> [A]lthough the prosecutor is the state's "official representative ... in the prosecution of the case," we have recognized that the police "also play[ ] an active role in the prosecution." *Hilliard v. Williams*, 516 F.2d 1344, 1350 (6th Cir.1975), *vacated in part*, 424 U.S. 961, 96 S.Ct. 1453, 47 L.Ed.2d 729, *aff'd on remand*, 540 F.2d 220 (6th Cir. 1976); *see also Walker v. Lockhart*, 763 F.2d 942, 958 (8th Cir. 1985) ("Police are treated as an arm of the prosecution for *Brady* purposes."). Because the prosecutor's office generally lacks its own investigative machinery, prosecutors often are entirely dependent on the police to turn over the fruits of their investigation. As a result of this interdependence, the police play a different, but no less significant role in the state's "search for truth in criminal

26

trials." *Strickler*, 527 U.S. at 281, 119 S.Ct. 1936.

> Because prosecutors rely so heavily on the police and other law enforcement authorities, the obligations imposed under *Brady* would be largely ineffective if those other members of the prosecution team had no responsibility to inform the prosecutor about evidence that undermined the state's preferred theory of the crime.  As a practical matter then, *Brady*'s ultimate concern for ensuring that criminal defendants receive a "fundamentally fair" trial, *see United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (explaining that the "purpose" of the *Brady* rule is "to ensure that a miscarriage of justice does not occur"), demands that "*Brady*'s protections also extend to actions of other law enforcement officers such as investigating officers," *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008).

*Id.* at 378.  Thus, "because the police are just as much an arm of the state as the prosecutor, the police inflict the same constitutional injury when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory information."[21] *Id.* at 379.

That being said, the Sixth Circuit recognized that the "manner in which prosecutors and police officers comply with *Brady* is different, reflecting their different functions in the criminal justice system." *Id.*  (quoting *Jean v. Collins*, 221 F.3d 656, 664 (4th Cir. 2000)).  "Police officers do not disclose evidence to criminal defendants directly." *Id*.  Rather, the police "accumulate evidence and then ministerially deliver it to the prosecutor," who then makes a discretionary legal judgment about whether the evidence constitutes *Brady* material.  *Id.*

While the prosecutor's legal judgment is necessary to the determination of whether a particular piece of evidence constitutes *Brady* material, the Sixth Circuit found that this "does not

---

[21]  The Sixth Circuit also determined that a police officer's obligation under *Brady* to disclose apparent, material, exculpatory information to the prosecution was clearly established at least by August 1990 and possibly as early as 1964, in light of "the overwhelming number of decisions from other circuits recognizing this type of claim."  *Id*. at 382.  *See also Elkins v. Summit County*, Ohio, 615 F.3d 671, 676 (6th Cir. 2010) ("In *Moldowan,* we found that 'at least three other circuits recognized prior to August 1990 . . .this right was clearly established,' *id.*, and that the right may have been clearly established as early as 1964.")

imply . . . that the police cannot be expected to recognize and determine what evidence should be preserved and turned over to the prosecutor." *Id.* at 380-381.  Indeed, where the "exculpatory value" of a piece of evidence is "apparent," the court found that police have "an *unwavering* constitutional duty to preserve and ultimately disclose that evidence" and, therefore, an individual officer can be held liable under § 1983 regardless of whether a plaintiff can show "bad faith" on the part of the officer.[22]  *Id.* at 388 (emphasis in original).

Applying the above concepts to Moldowan's § 1983 claim against Detective Ingles, the Sixth Circuit found "it is evident that Burroughs' statements cast serious doubt on, if not entirely discredit, Fournier's identification of Moldowan as one of her attackers." *Id.*  Thus, the court found Burroughs' statements constituted material, exculpatory evidence that should have been disclosed to the defense.  Moreover, the Sixth Circuit found that, "even if we were inclined to believe that bad faith was required, we still would not conclude that Detective Ingles is entitled to summary judgment" because there was sufficient evidence in the record to allow a reasonable jury to find bad faith.  *Id.* at 389.

Since *Moldowan*, the Sixth Circuit has reiterated that "*Brady* requires a police officer to disclose evidence to the prosecutor only when its exculpatory value is 'apparent' to the officer . . .; that is, when the officer is aware that the evidence 'could form a basis for exonerating the defendant.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014) (quoting *Moldowan*, 578 F.3d at 384, 388).  *See also Elkins v. Summit County, Ohio*, 615 F.3d 671, 676 (6th Cir. 2010) (in order to show a *Brady* violation by defendant police officer, § 1983 plaintiff must "provide

---

[22]  On the other hand, where the evidence is "merely potentially useful," a plaintiff must make the additional showing of "bad faith" on the part of the officer in order to impose liability under § 1983.  *Id.* at 383-386.

evidence that 'the exculpatory value' of the evidence [was] apparent'"); *Army v. Collins*, 2012 WL 2913736 at * 4 (6th Cir.  July 18, 2012) (stating that *Brady* also imposes an analogous or derivative obligation on the police to "disclose evidence whose 'exculpatory value' is 'apparent' to officers").  "Because an officers' 'destruction or concealment' of obviously exculpatory evidence 'can never be done in good faith and in accord with [the officer's] normal practice," . . . this rule is 'the functional equivalent' of a requirement that the officer act in bad faith.'" *D'Ambrosio*, 747 F.3d at 389 (quoting *Moldowan*, 578 F.3d at 389 and Kethledge, J. opinion concurring in part and dissenting in part, at 407).

Here, Defendant Hyams first maintains he is entitled to summary judgment because "the facts show that [he] did not fail to disclose any exculpatory evidence."  (Doc. No. 91-1 at 6, 17.) He claims "[t]he third amended complaint focuses on allegations that Det. Hyams failed to disclose a communication in which Stout allegedly stated that the child was inconsistent about penetration."  *Id*. at 17.  Hyams argues he "clearly disclosed" this communication when he wrote in his police report that Ms. Stout left him a voice mail message indicating M.M. told her "she felt the suspect fondling her vagina and anus."  Hyams asserts the reference to "fondling" is clearly not "tantamount to penetration" and, therefore, he "did in fact disclose the alleged inconsistency with regards to penetration."  *Id*.  Moreover, citing Stout's deposition testimony, Hyams further argues "there is no evidence that Stout ever actually told [him] that the child denied penetration." *Id*. at 18.  Thus, he maintains Vaughan's *Brady* claim fails because "the plaintiff cannot show that Det. Hyams withheld any information."  *Id*.

Vaughan disagrees.  He asserts that "[w]riting the word fondling is not the same thing as disclosing that the Minor denied penetration to Stout during the first and only one on one

interview of the Minor."  (Doc. No. 106-1 at 32.)  Vaughan notes two of the criminal defense

attorneys that represented him at his second trial testified in deposition that "writing 'fondling'

and writing that the child did not report penetration are two completely different things."  *Id.*  He

emphasizes that prosecutors Keller or Skutnik both testified they were not aware of Ms. Stout's

alleged communication to Hyams that M.M. did not disclose penetration during Ms. Stout's

September 18, 2006 interview with M.M.  Moreover, Vaughan directs the Court's attention to

Skutnik's deposition testimony that "if there was a statement to that effect that was available to

law enforcement, as a prosecutor, then it should have been provided to defense counsel."  (Doc.

No. 92-9 at Tr. 77-78.)

   As an initial matter, it is important to clarify the precise nature of the exculpatory

evidence that Vaughan is claiming was suppressed.  For this, the Court looks to Count I of the

Third Amended Complaint, which sets forth Vaughan's *Brady* claim against Defendant Hyams.

Therein, Vaughan alleges the following:

> 98. Defendant Hyams failed to disclose apparent, material and exculpatory evidence.  Specifically, he failed to disclose that **Ms. Stout had told him that her assessment of M.M. had led her to conclude that Vaughan had never penetrated M.M.**

> 99. Defendant Hyams also failed to disclose that he learned from Ms. Stout that **M.M. never told her (Ms. Stout) that Vaughan had committed any act that supported the charge of rape**, for which Vaughan was indicted and wrongfully convicted.

(Doc. No. 80 at ¶¶ 98, 99) (emphasis added).  Moreover, in the body of the Third Amended

Complaint, Vaughan alleges Ms. Stout "informed Defendant Hyams that M.M. did not say that

Vaughan had penetrated her vaginally or anally" but Hyams "never disclosed [this] information . .

. to any other person, including, but not limited to members of the Shaker Heights police

department or the Cuyahoga County Prosecutor." *Id.* at ¶¶ 36, 40.

Thus, the threshold issue in resolving the parties' cross motions for summary judgment is whether Vaughan has come forward with any evidence to support his allegations that (1) M.M. did not disclose to Ms. Stout that Vaughan had vaginally or anally penetrated her; (2) Ms. Stout's interview of M.M. led her to conclude that Vaughan had never penetrated M.M.; and, (3) Ms. Stout conveyed this information to Detective Hyams.  The Court finds that he has.  As Vaughan correctly notes, Ms. Stout testified about these very issues during the March 2009 hearing on Vaughan's motion for new trial before Judge Matia.  Specifically, Ms. Stout testified that:

> Q:   Did you ask [M.M] during this interview whether or not she was penetrated?
>
> A:   Yes, I did.
>
> Q:   And you made it very clear or did you make it very clear what penetration– I would like you to tell the judge what exactly did you ask her?
>
> A:   That's why I hesitated a little.  I never try to ask any leading questions but I asked [M.M.] if she was touched on the inside or on the outside or in some other way, and she told me she was not touched on the inside, and then that's when I clarified to her then can you tell me how you were touched, and she said that his hand was inside her underwear.
>
> Q:   Did you follow up at all on that because it seems to be a pretty important point.
>
> A:   **Oh, yes. I felt very confident when I walked away from her that when she awoke, she woke up because she described that something hurt like an ouch, and she even said that she kind of scooched up on her bed because it hurt, and she, what she described was being more like poked but externally.  I was able to determine externally, not internally.**
>
> * * *

> **Q:**   **So just to revisit under all the different possibilities of penetration, you were confident after all your interviews that she was not penetrated in any form?**
>
> **A:**   **Correct.**

(Doc. No. 107-1 at Tr. 36, 39).[23]

Ms. Stout further testified that she conveyed this information to Defendant Hyams, as

follows:

> Q:   Okay, so I'm going to ask some very specific questions here**.  Did you tell Detective Hyams that [M.M] denied penetration ?**
>
> **A:**   **I didn't say it exactly like that but I did say that [M.M.] did not disclose any penetration to me.**
>
> Q:   I'm sorry. I'm not drawing this from the reports so I appreciate that and that's really confusing.  Those are my words.  What exactly did you say to Detective Hyams as relates to penetration?
>
> A:   That [M.M.] did not disclose any type of penetration.
>
> **Q:**   **What else did you tell Detective Hyams on that particular phone call?**
>
> **A:**   **I do recall telling him that I felt that [M.M.] was an accurate reporter.  That she did have the ability when I established competency, that she knew colors, she knew right from wrong, but I did indicate to him, Detective Hyams, that I really did not see in this situation that any penetration occurred.**

(Doc. No. 107-2 at Tr. 15.)  Based on the above, the Court finds Vaughan has come forward with

sufficient evidence to support his claim that Ms. Stout conveyed "favorable" evidence [24] to

---

[23] The testimony highlighted in bold is testimony which Ms. Stout reviewed and confirmed the accuracy of in deposition.  (Doc. No. 92-3 at Tr. 166-169.)

[24] Defendants do not challenge that the allegedly suppressed evidence at issue (i.e., Ms. Stout's alleged statement that M.M. did not disclose penetration and Ms. Stout's independent conclusion that no penetration occurred) is "favorable" within the meaning of *Brady*.

Defendant Hyams; i.e. evidence that is potentially exculpatory on the issue of whether he, in fact, raped M.M.[25]

The next question, then, is whether Hyams had a duty to disclose the exculpatory evidence at issue to the prosecution.[26]  Hyams maintains he did not, arguing there is no genuine dispute Vaughan was aware of the "essential facts" that would have enabled him to learn of Ms. Stout's alleged statement to Hyams that M.M. did not disclose penetration.  Specifically, Hyams argues "there is no actionable claim because the prosecution and the defense attorney [Joseph Dubyak] were aware of Stout's existence, that she interviewed the child, and that the child provided varying accounts of penetration."  (Doc. No. 108 at 20.)  He notes that Mr. Dubyak, in fact, subpoenaed Stout's records from the Summit County DCFS, and could have sought *in camera* review of those records but inexplicably failed to do so.  Moreover, Hyams maintains "[Mr.] Dubyak could have simply picked up the phone"and called Ms. Stout to obtain her conclusions

_____

[25] Defendants emphasize deposition testimony of Ms. Stout that appears to contradict her hearing testimony.  Specifically, Defendants note Ms. Stout testified in deposition that she (1) did not explore whether "the tip of [Vaughan's] finger had penetrated [M.M.'s] anus ever so slightly;" and, (2) did not rule out the possibility that there had been "penetration ever so slight." (Doc. No. 92-3 at Tr. 113.)  In addition, Defendants emphasize Stout's deposition testimony that she could not recall whether the issue of penetration ever came up in her September 2006 conversations with Hyams.  *Id*. at Tr. 106, 143.  The Court agrees that Ms. Stout's deposition testimony is, at times, difficult to reconcile with her hearing testimony.  However, for purposes of ruling on Defendant Hyams' summary judgment motion, the Court will construe Ms. Stout's various testimony in a light most favorable to Vaughan.

[26] As noted *supra*, Hyams argues at length that he did, in fact, disclose this evidence when he wrote in his police report that Ms. Stout told him M.M. she "felt the suspect fondling" her.  The Court is not convinced that Hyams' use of the word "fondling" necessarily conveyed the particular exculpatory evidence at issue herein; i.e., that M.M. did not disclose penetration to Ms. Stout and, further, that Ms. Stout concluded based on her interview that M.M. was not penetrated in any form.  However, the Court need not reach this particular issue as it finds, *infra*, that Hyams did not have a duty to disclose this evidence because Vaughan was aware of the "essential facts" that would have enabled him to obtain this exculpatory evidence.

from her interview of M.M.   He further notes that Ms. Stout testified she would have talked to Mr. Dubyak had he called her.  Based on the above, Hyams asserts Vaughan "knew or should have known the essential facts permitting him to take advantage of" the alleged exculpatory information at issue herein and, therefore, there was no duty to disclose that evidence under *Brady/Moldowan*.

Vaughan argues he was "not aware of the essential facts that would enable him to take advantage of the exculpatory information he learned from Stout." (Doc. No. 106-1 at 30.)  He asserts that "no prosecutor had the exculpatory statements made by the Minor and disclosed to Hyams through Stout" and, further, that Hyams' disclosure of Ms. Stout's identity was not sufficient to disclose this exculpatory evidence.  Moreover, Vaughan argues Ms. Stout and Hyams were a "'team' partnered together, both working for the State of Ohio in an investigation [of] an alleged crime" and, therefore, the exculpatory information learned by Stout was "controlled by the State of Ohio."  Thus, Vaughan maintains he was not able to obtain this information from another source because it was wholly within the control of Defendant Hyams.

As noted above, it is well-established that where a defendant was "aware of the essential facts that would enable him to take advantage of the exculpatory evidence," the government's failure to disclose such evidence does not violate the principles set forth in *Brady.  See Spirko*, 368 F.3d at 610.  The Sixth Circuit has explained this rule as follows:

> Like several of our sister circuits, this circuit has held that because *Brady* did not alter the rule that defendants have no general constitutional right to discovery in criminal cases, a prosecutor violates his constitutional duty of disclosure only if "his omission is of sufficient significance to result in the denial of defendant's right to a fair trial," *United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990) (quoting *United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)), and **where the defendant was "aware of the essential facts that would enable him to take advantage of the exculpatory evidence," the**

**government's failure to disclose it did not violate *Brady*.  *Id.*  In *Todd,* we found no *Brady* violation where the prosecutor had disclosed to the defense the fact that two witnesses possibly possessed exculpatory evidence but did not disclose what that evidence was.  *See also United States v. Clark*, 928 F.2d 733, 738 (6th Cir.1991) (quotations and citation omitted) (holding that there is no *Brady* violation if the defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory information or where the evidence is available to defendant from another source").  The Fourth Circuit has held that "the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources," *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990) (quoting *United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir. 1986)); and "where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine."  *Id.* at 381.  The Second Circuit (*United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988)) and the First Circuit (*Lugo v. Munoz*, 682 F.2d 7, 9-10 (1st Cir. 1982)) have similarly ruled.**

*Spirko,* 368 F.3d at 610 (emphasis added).  *See also Jeffries v. Morgan*, 446 Fed. Appx. 777, 782 (6th Cir. 2011) (noting that *Spirko* "emphasized that a defendant only need have 'the essential facts that would enable him to take advantage of the exculpatory evidence,' rather than all of the state's evidence on the point in question"); *Smith v. Metrish*, 436 Fed. Appx. 554, 564 (6th Cir. 2011) ("Because [the exculpatory] information was 'not only available to [Petitioner] but also l[ay] in a source where a reasonable defendant would have looked, [Petitioner] is not entitled to the benefit of the *Brady* doctrine'") (quoting *Spirko*, 368 F.3d at 610).  Moreover, the Sixth Circuit has held that this principle applies "with equal force to *Moldowan*-type claims against a police investigator."  *Army v. Collins*, 2012 WL 2913736 at * 4 (6th Cir. July 18, 2012) (finding that plaintiff's *Moldowan* claim failed, in part, because "[n]othing seems to have prevented [plaintiff] from himself subpoenaing [the exculpatory] phone records" at issue).

It is undisputed that Vaughan's first criminal defense lawyer, Joseph Dubyak, was aware that the Summit County DCFS had interviewed M.M.  (Doc. No. 92-5 at Tr. 19-20.)  Indeed, Mr.

Dubyak testified in deposition that he "assumed that Summit County Department of Children and Family Services had interviewed the alleged victim" and had, therefore, subpoenaed DCFS records. *Id.* at Tr. 19-21.  Moreover, Cuyahoga County Prosecutor Carol Skutnik testified in deposition that she orally disclosed to Mr. Dubyak that the Summit County DCFS had interviewed M.M. (Doc. No. 92-9 at Tr. 23-24.)  She further testified that she provided "full oral discovery" to Mr. Dubyak, which included summarizing both the Summit County DCSF interview and the Hyams' police report. *Id.* at 14.  Finally, Ms. Skutnik testified that Ms. Stout was disclosed as a State's witness in Vaughan's first criminal trial. *Id.* at Tr. 12.  The disclosure of Ms. Stout's identity as a State's witness was also confirmed in Mr. Dubyak's deposition. (Doc. No. 92-5 at Tr. 20-21.)

Mr. Dubyak further testified that he was "concerned from the beginning of the case as to whether or not the element of penetration was in evidence" and stated that "probably that is one of the reasons that Children and Family Services records were subpoenaed." *Id.* at 21.  He assumed (it turns out, incorrectly) that Cuyahoga County Judge Russo reviewed the DCFS records and found nothing exculpatory.[27] *Id.* at 25.  Mr. Dubyak explained he made no effort to locate Ms. Stout and interview her because he believed she would not talk to him because "all that stuff is privileged under the law." *Id.* at 23.

Ms. Stout, however, testified in deposition that she would have spoken with Mr. Dubyak

_____

[27]  When ruling on Vaughan's motion for new trial in March 2009, Judge Matia explained that he had obtained the Summit County DCFS records and found therein a May 8, 2008 letter from DCFS attorney Montrella Jackson to Judge Russo which enclosed that agency's confidential records regarding M.M. (Doc. No. 107-2 at 146-147.)  Judge Matia noted that, according to this letter, these records were transmitted to Judge Russo two months after Vaughan's first criminal trial. *Id.* at 147.  Therefore, it was "pretty clear to this Court that Judge Russo never performed an *in camera* inspection of the records." *Id.*

36

had he contacted her.  (Doc. No. 92-3 at Tr. 94.)  Indeed, she did exactly that when she was

contacted by Keith King, the investigator hired by Vaughan's second set of criminal defense

lawyers.  Ms. Stout testified that, when Mr. King contacted her, she got permission to talk to him

from an attorney representing Summit County DCFS and thereafter spoke on the phone with Mr.

King and answered his questions.  *Id.* at 71-72.  In fact, Ms. Stout recalled speaking with Mr.

King "maybe a half dozen times."  *Id.* at 78.  She explained that she "assisted [Mr. King] because

[she] was ethically obligated to do so."  *Id.* at 75.

Based on the above, the Court finds there is no genuine issue of material fact that

Vaughan was aware of the "essential facts" that would have allowed him to obtain the

exculpatory information at issue.  Vaughan's lawyer was aware of Ms. Stout's identity and was

aware that M.M. had been interviewed by Summit County DCFS.  Further, Mr. Dubyak was

aware of the importance of that interview, even going so far as to subpoena DCFS records

relating to the September 10, 2006 incident.  However, based on the mistaken beliefs that Ms.

Stout would not speak to him and that Judge Russo had reviewed the DCFS records and found

nothing exculpatory, Mr. Dubyak made no efforts to speak with Ms. Stout.  Had he done so, it

appears Ms. Stout would have spoken with him and told him that M.M. did not disclose

penetration during the September 18, 2006 interview, just as she did when Vaughan's new

defense team contacted her.

Moreover, the Court rejects the suggestion that the disclosure of Ms. Stout's identity was

insufficient to alert Vaughan of the "essential facts" that would have allowed him to obtain the

exculpatory evidence.  As an initial matter, it was not just Ms. Stout's identity that was disclosed

to Vaughan's first defense lawyer.  Ms. Skutnik testified that she not only listed Ms. Stout on the

State's witness list, but also disclosed to Mr. Dubyak that the Summit County DCFS had interviewed M.M. and summarized that interview as part of oral discovery.  (Doc. No. 92-9 at 14-15, 29.)  Moreover, Mr. Dubyak's deposition testimony indicates he understood the importance of obtaining the DCFS investigation in this case, when he acknowledged that the issue of penetration was a central issue in the case and stated "probably that is one of the reasons" he subpoenaed the DCFS records in the first instance.  (Doc. No. 92-5 at Tr. 21.)  Judge Matia also highlighted the obvious importance of a County Children's Services investigation in child rape cases such as that involving M.M., stating that "I think all would agree that in a case in which allegations of child rape are made, it is standard to request the Court to conduct an *in camera* inspection of any records made by the Department of Children & Family Services."  (Doc. No. 107-2 at 146.)  Thus, the Court finds the exculpatory evidence at issue herein "was not only available to [Vaughan] but also l[ay] in a source where a reasonable defendant would have looked."  *Spirko*, 368 F.3d at 610.

The Court also rejects Vaughan's argument that he would not have been able to obtain the exculpatory evidence at issue because Ms. Stout and Hyams were a "'team' partnered together, both working for the State of Ohio in an investigation [of] an alleged crime" and, therefore, the exculpatory information learned by Stout was "controlled by the State of Ohio."  Vaughan cites no legal authority in support of this argument.  Moreover, Ms. Stout testified in deposition that she did not consider Defendant Hyams to be her "partner" in the investigation of the incident involving M.M.  (Doc. No. 92-3 at Tr. 153.)  Further, as noted above, Ms. Stout explained that she would have spoken to Mr. Dubyak had he contacted her, just as she spoke with an investigator hired by Vaughan's new defense team.  (Doc. No. 92-3 at Tr. 94.)  Thus, the Court

38

finds Vaughan's argument that the information at issue was somehow not available to him because Ms. Stout and Hyams were a "team," to be without merit.

Finally, the Court rejects Vaughan's argument that Judge Matia's bench ruling granting his motion for new trial, in and of itself, creates a genuine issue of material fact regarding whether Hyams failed to disclose exculpatory evidence in violation of *Brady/Moldowan*. Judge Matia found Vaughan had come forward with newly discovered evidence that justified a new trial under Ohio Rule of Criminal Procedure 33 and Ohio Revised Code § 2945.79. This ruling is based on an interpretation of state law in the context of a state criminal trial and does not have any direct bearing on whether Defendant Hyams is entitled to qualified immunity in a civil action brought under 42 U.S.C. §1983 for failing to disclose exculpatory evidence pursuant to *Brady/Moldowan*. Judge Matia's ruling was issued in the context of an entirely different legal framework than that which is currently before the Court in this civil action. Moreover, as Defendants correctly note, a great deal of evidence has been developed since Judge Matia's ruling that is directly relevant to the issues presented herein, including the deposition testimony of Ms. Skutnik, Mr. Dubyak, Ms. Stout, and Defendant Hyams. Thus, the Court rejects the argument that Judge Matia's decision to grant Vaughan a new trial creates a genuine issue of material fact that precludes summary judgment in Defendant Hyams' favor on Vaughan's *Brady* claim.

Accordingly, it is recommended the Court find Defendant Hyams did not have a duty to disclose the exculpatory evidence at issue herein because Vaughan was "aware of the essential facts that would [have] enable[d] him to take advantage of" that evidence. *See Spirko*, 368 F.3d at 610. Accordingly, under the first tier of the qualified immunity analysis, it is recommended the Court find that no constitutional violation occurred and Defendant Hyams is entitled to immunity

39

with respect to Vaughan's *Brady* claim under § 1983. The Court need not reach the second tier of the qualified immunity analysis; i.e. whether the constitutional right violated was clearly established. As the Supreme Court has explained, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). *See also Pearson*, 555 U.S. at 236; *Klein v. Long*, 275 F.3d 544, 552 (6th Cir. 2001).

Therefore, it is recommended the Court find Defendant Hyams is entitled to summary judgment in his favor on the basis of qualified immunity with respect to Vaughan's §1983 claim for failure to disclose exculpatory evidence under *Brady*. It is further recommended that Vaughan's Motion for Partial Summary Judgment against Defendant Hyams with respect to Vaughan's § 1983 *Brady* claim be denied.

### C.   Fabrication of Evidence Claim

Defendant Hyams also moves for summary judgment in his favor on Vaughan's fabrication of evidence claim. Although not clearly delineated as a cause of action, the Third Amended Complaint does allege that, after Vaughan was arrested and charged with Gross Sexual Imposition, Hyams filled out two "Case Information Sheets" ("CIFs") that were forwarded to the Cuyahoga County Prosecutor's Office. (Third Amended Compl. at ¶¶ 56, 57.) On these forms, Hyams indicated that Vaughan "digitally penetrated victim's vagina and anus." *Id.* Vaughan alleges that, when he filled out these forms, Hyams "knew from Ms. Stout that M.M. had never told Stout that Vaughan had vaginally or anally penetrated her" and, further, "knew that what he wrote on the forms contradicted what M.M. had told Ms. Stout." *Id.* at ¶ 58. By filling out these two sheets, Vaughan claims Hyams "essentially manufactured false evidence that Vaughan had

vaginally and anally penetrated M.M." and disseminated this evidence in "official public investigatory documents that he completed for Shaker Heights Police Department and for Cuyahoga County."  *Id.* at ¶¶ 59, 60.

 Hyams maintains he is entitled to summary judgment on this claim "because (1) the information in the CIFs was correct in that there was evidence that the plaintiff vaginally and anally penetrated the victim; and, (2) the documents were not 'evidence' in that they were not relied on during the criminal prosecution."  (Doc. No. 91-1 at 25.)  Vaughan does not address Hyams' arguments on this issue.

The Sixth Circuit held "that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006) citing *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997).  As explained in another decision from this District:

> When "evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have effected the decision of a jury," a plaintiff can prevail on a claim of fabrication of evidence under § 1983.  *Gregory*, 444 F.3d at 737; *see also Higazy v. Templeton*, 505 F.3d 161, 176 (2d. Cir. 2007) (quoting *Zahrey v. Coffey*, 221 F.3d 342, 344 (2d. Cir. 2000)) ("'[T]here is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity, at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty.' ").  As articulated in *Richardson v. Nasser*, No. 08–12951, Sl. Cop., 2009 WL 4730446, *6 (E.D. Mich. Dec. 9, 2009), "a plaintiff must prove that (1) a fabrication of evidence occurred and (2) the defendant was aware of the fabrication. Even then, not all cases of fabrication of evidence are actionable. If the fabricated evidence does not effect a jury's decision, a plaintiff cannot prevail."

*Williams v. Lucas*, 2011 WL 4632883 at * 9 (N.D. Ohio Sept. 30, 2011).  *See also Richardson v. Nasser*, 2009 WL 4730446 at * 6 (E.D. Mich. Dec. 9, 2009); *O'Connor v. Kelty*, 2013 WL

41

322199 at * 6 (N.D. Ohio Jan. 24, 2013).

The Court finds Defendant Hyams is entitled to summary judgment in his favor with respect to this claim.  Even if the Court were to assume that Hyams knew the information he wrote on the CIFs contradicted what he was told by Ms. Stout, there is no evidence that the CIFs "would have effected the decision of the jury." *Gregory*, 444 F.3d at 737.  Prosecutor John Gallagher testified in deposition as a Fed. R. Civ. P. 30(b)(6) witness on behalf of the Cuyahoga County Prosecutor's Office regarding the policies and procedures of that office with respect to grand jury proceedings.  (Doc. No. 92-2 at 5-6.)  He explained that CIFs are administrative documents that trigger the County Prosecutor's Office to set up a file for a suspect.  *Id*. at 42-47. He stated such documents are not charging instruments and are not presented to the grand jury. *Id.*  Mr. Gallagher further testified that, in deciding what charges to bring, the grand jury prosecutor reviews the entire contents of the file submitted by a municipal prosecutor or police department, including any relevant police reports and witness statements.  *Id.* at 9.  He explained that, although the CIFs are included in that file, such documents would only be relied upon by prosecutors "minimal[ly] at best."  *Id.* at 45-46.  Finally, he testified that the County Prosecutor is not bound by the description of the offense by a detective and, further, that it is the County Prosecutor (not the detective) who decides what charges to bring.  *Id.* at 43-46.

Vaughan has not directed the Court's attention to any evidence that contradicts Mr. Gallagher's testimony or otherwise suggests that the allegedly inaccurate CIFs in this matter effected the decision of the jury.  According to Mr. Gallagher's undisputed testimony, the CIFs are not charging instruments, were not presented to the jury, and were not relied on in any significant fashion by the grand jury prosecutor in determining what charges to bring against

42

Vaughan.  Moreover, even assuming the CIFs were relied on in some substantive fashion by the County Prosecutor's Office, the Court notes that the CIFs were not the only documents in this case that suggested Vaughan penetrated M.M.  As noted *supra*, Corporal Srsen's police report indicated M.M. told Srsen that Vaughan "put his fingers in her anus."  (Doc. No. 90-2 at 21.)  Moreover, M.M.'s medical records from University Hospitals indicate that "the guy carried [M.M.] over to the bedroom and put her in bed and reportedly inserted his finger in her vagina and anus."[28] (Doc. No. 90-2 at 51.)

Thus, based on the above, the Court finds Vaughan has failed to come forward with any evidence suggesting a reasonable likelihood that the allegedly fabricated evidence herein (i.e. the CIFs) would have effected the decision of the jury.  Accordingly, it is recommended that Defendant Hyams be granted summary judgment with respect to this claim.

**D.     Intentional Infliction of Emotional Distress Claim**

In its Second Ground for Relief, the Third Amended Complaint states a claim against Defendant Hyams for intentional infliction of emotional distress.  (Third Amended Compl. at ¶¶ 106-113.)  Therein, Vaughan alleges that "Defendant Hyams' acts of hiding evidence that demonstrated Vaughan's innocence on the charge of rape of a minor with force or threat of force was undertaken with intent or knowledge that there was a high probability that his conduct would inflict severe emotional distress and done with reckless disregard of that probability."  *Id.* at ¶ 108.  Vaughan further alleges that Hyams' "fabrication of evidence to bolster a version of the

---

[28] The Court further notes that, although the transcript of Vaughan's second criminal trial is not part of the record herein, it is undisputed that the jury in that trial deliberated on the charge of rape.  Thus, it can be safely assumed that there was sufficient evidence of rape presented during that second criminal trial to withstand an Ohio Rule of Criminal Procedure 29 motion for acquittal.

events that the victim herself contradicted, including [Hyams'] false written investigatory statements of Vaughan's digital penetration of M.M.'s anus and vagina, was undertaken with similar reckless disregard of the intended or likely severe emotional consequences to Vaughan." *Id*. at ¶ 109.  Vaughan claims Hyams' alleged actions were extreme and outrageous and resulted in severe mental distress "that no reasonable person could be expected to endure."  *Id.* at ¶¶ 111, 112.

Hyams maintains he is entitled to summary judgment on this claim because "to the extent the claim is based on [his] alleged failure to disclose exculpatory evidence to defense counsel, case law establishes he had no duty," and "to the extent it is based on fabricating evidence, it is clear that he did not do so."  (Doc. No. 91-1 at 29.)  Hyams further maintains that, although "the fact that plaintiff suffered because he was convicted of rape is regrettable," there is no evidence Hyams acted in bad faith or that his conduct was "outrageous and extreme beyond all bounds of decency."  *Id.*

Vaughan argues that Ms. Stout's sworn testimony "has at the very least created a genuine issue of material fact that precludes granting Hyams Summary Judgment" with respect to this claim.  (Doc. No. 106-1 at 35.)  He further asserts that Hyams' conduct was extreme and outrageous and directly resulted in Vaughan spending "356 days in the Cuyahoga County Corrections Center in constant fear of suffering jailhouse retribution for a heinous crime that he did not commit."  *Id*. at 36.

"Under Ohio law, a plaintiff must demonstrate that: (1) the defendant intended to cause emotional distress, or knew or should have known that his conduct would result in serious emotional distress to the plaintiff; (2) the defendant's conduct was outrageous and extreme

beyond all bounds of decency and subsequently can be characterized as utterly intolerable in a civilized community; (3) the defendant's conduct was the proximate cause of plaintiff's psychic injuries; and (4) the plaintiff's emotional distress was serious, and of such a nature that no reasonable person could be expected to endure it."  *Bolander v. BP Oil Co.*, 128 Fed. Appx. 412, 419 (6th Cir. 2005) (citing *Ekunsumi v. Cincinnati Restoration, Inc.*, 120 Ohio App.3d 557, 561, 698 N.E.2d 503 (Ohio Ct.App.1997) and *Yaeger v. Local Union 20*, 6 Ohio St.3d 369, 375, 453 N.E.2d 666 (1983) (abrogated on other grounds by *Welling v. Weinfeld*, 113 Ohio St.3d 464 (2007)).[29]  "To say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement." *Baab v. AMR Services Corp.*, 811 F.Supp. 1246, 1269 (N.D.Ohio 1993).  *See also Norman v. City of Lorain, Ohio*, 2006 WL 3337466 at * 2 (N.D. Ohio Nov. 16, 2006); *Martin v. City of Broadview Heights*, 2011 WL 3648103 at * 17 (N.D. Ohio Aug. 18, 2011).[30]

The Court finds Defendant Hyams is entitled to summary judgment with respect to this claim.  As set forth above, the Court has already determined that Hyams did not have a duty to disclose the allegedly exculpatory evidence at issue herein because there is no genuine issue of material fact that Vaughan was aware of the "essential facts" that would have enabled him to take advantage of this information.  In light of this finding, the Court cannot say that Hyams' alleged

---

[29] Although *Yeager* was abrogated in part by *Welling*, it was not abrogated with regard to the elements of intentional infliction of emotional distress. *See also Martin v. City of Broadview Heights,* 2011 WL 3648103 at * 17, fn 5.

[30] Although employees of a political subdivision may be entitled to immunity under Ohio Rev. Code § 2744.03(A)(6) under some circumstances, "Ohio law does not immunize the acts or omissions of officers done with 'malicious purpose, in bad faith, or in a wanton or reckless manner.'" *Martin v. City of Broadview Heights*, 712 F.3d 951, 963 (6th Cir. 2013) (quoting Ohio Rev. Code § 2744.03(A)(6)(b)).

failure to disclose this evidence was "so outrageous and extreme beyond all bounds of decency and subsequently can be characterized as utterly intolerable in a civilized community." *Bolander*, 128 Fed. Appx. at 419.  Similarly, this Court has found that, even assuming Hyams knew the information he wrote on the CIFs contradicted what he was told by Ms. Stout, there is no evidence that the CIFs "would have effected the decision of the jury."  *Gregory*, 444 F.3d at 737. Moreover, as set forth *supra,* there was additional evidence that suggested Vaughan penetrated M.M., including Corporal Srsen's police report and M.M.'s medical records from University Hospitals.  Indeed, it is undisputed that Vaughan's second criminal trial was not resolved via motion for acquittal and, thus, sufficient evidence of penetration must have been presented during that trial to warrant submitting the charge of rape to the jury for deliberation.  Thus, the Court cannot find that Hyams' alleged fabrication of evidence (i.e., the CIFs) was the proximate cause of Vaughan's emotional distress.

Accordingly, and for all the reasons set forth above, it is recommended the Court find that Defendant Hyams is entitled to summary judgment in his favor with respect to Vaughan's intentional infliction of emotional distress claim.

### E.     Indemnification Claim

Finally, Defendant City of Shaker Heights moves for summary judgment in its favor with respect to Vaughan's indemnification claim.  (Doc. No. 90-1 at 23.)  Because the Court has found that Defendant Hyams should be granted summary judgment in his favor with respect to all of Vaughan's claims against him, the City of Shaker Heights would have nothing to indemnify. Therefore, it is further recommended that Defendant Shaker Heights' motion for summary judgment with respect to Vaughan's indemnification claim be denied as moot.

46

### V.  Conclusion

Accordingly, and for all the reasons set forth above, it is recommended that (1) Defendant Douglas Hyams' Motion for Summary Judgment (Doc. No. 91) be GRANTED; (2) Defendant City of Shaker Heights' Motion for Summary Judgment (Doc. No. 90) on Plaintiff's indemnification claim be DENIED AS MOOT; and, (3) Plaintiff James Vaughan's Partial Motion for Summary Judgment against Defendant Hyams (Doc. No. 95) be DENIED.


/s/ Greg White
U.S. Magistrate Judge

Date:  October 27, 2014

47